IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

SHORELINE ALLIANCE, et al.,

      Plaintiffs,

v.                                  No. 12-1282

TENNESSEE VALLEY AUTHORITY,

      Defendant.

_____

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

*INTRODUCTION*

The Plaintiffs, Shoreline Alliance, an unincorporated association (sometimes referred to

herein as the "Association")[1]; David and Carole Merritt; Judy Barnhill; Larry and Marilyn Halters;

Judy Denmon; Katharine Haskins; Jewell Snelling; Eddie McGregor; Charles and Betty Whitlow;

Wayne and Nancy Courtney; Denise Wilson (collectively, the "Individual Plaintiffs"); BCK, Inc.

d/b/a Southern Komfort Village and Marina[2] ("Southern Komfort") and Britton Ford Campground

("Britton Ford") (sometimes collectively referred to as the "Campground Plaintiffs"), on behalf of

themselves and similarly situated campers on privately developed and privately run campgrounds

---

[1]According to the complaint, the Association is made up of privately developed and operated campgrounds and marina businesses located on land owned by the Tennessee Valley Authority and campers who use their services, as well as nearby businesses, organizations and communities. It was initially organized by campers at Perryville Marina Campground in Decatur County, Tennessee but grew to include campers at other facilities along the 11,000 miles of shoreline overseen by the Tennessee Valley Authority in the Tennessee River system.

[2]This Plaintiff has been referred to in various documents as "Southern Comfort Village and Marina" and "Southern Komfort Village and Marina." For purposes of consistency, the Court will refer to it using the latter spelling.

on Tennessee Valley Authority ("TVA") land and similarly situated commercial recreation businesses located on TVA land, filed an amended complaint for declaratory judgment, temporary restraining order and request for preliminary and permanent injunction on January 3, 2013 against the TVA, alleging violation of the National Environmental Policy Act, 42 U.S.C. § 4321, *et al.* ("NEPA") and the Independent Offices Appropriations Act, 31 U.S.C. § 9701 ("IOAA"). On January 31, 2013, pursuant to an order of reference, the magistrate judge entered a report and recommendation in which he recommended that the Plaintiffs' request for injunctive relief be denied. (D.E. 30.) The Plaintiffs have filed objections to the report and recommendation. (D.E. 32.) Also pending before the Court is the motion of the Defendant for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (D.E. 23.) As it deems it more expeditious, the Court will focus its attention on the dispositive motion.

*STANDARD OF REVIEW*

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To survive summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Pucci v. Nineteenth Dist. Ct., 628 F.3d 752, 759-60 (6th Cir. 2010) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)) (internal quotation marks omitted). "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party." Id. at 759 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions,

not those of a judge." Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 748 (6th Cir. 2012) (quoting

Anderson, 477 U.S. at 255, 106 S. Ct. 2505). "Entry of summary judgment is appropriate against

a party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." In re Morris, 260

F.3d 654, 665 (6th Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548,

91 L. Ed. 2d 265 (1986)) (internal quotation marks omitted).

*FACTS*

The following facts are undisputed unless otherwise noted. There are approximately 180

TVA and private marinas and campgrounds on TVA property. Historically, the agency has

permitted private persons and entities to construct and/or operate facilities on its property under

licenses that were terminable on thirty days' notice. These licenses generally required licensees to

pay annual rents and comply with established conditions for operating facilities, such as the

preclusion of permanent structures without TVA approval. The license fees varied from facility to

facility.

In 2009, TVA's Office of Inspector General audited the marina and campground license

program and concluded in part that

> reevaluation of annual fees have not been consistently performed . . . reviews of
> monthly invoicing for campground and marina operators may not be adequate . . .
> structures have been built on TVA properties without TVA approval . . . [and] TVA
> faces reputational risk . . . primarily related to the monitoring and enforcement of
> violations and encroachments.

(D.E. 24 at 2-3.) In response, TVA commissioned a study from Deloitte Financial Advisory

Services LLP into industry practice and valuation of publicly available commercial campgrounds

and marinas. Deloitte reviewed the practices of the United States Army Corps of Engineers, the

State of Kentucky and investor-owned facilities; visited over thirty campgrounds and marinas operated on TVA land; interviewed seven operators and reviewed sixteen campground agreements and eighteen marina contracts. Among its key recommendations were that TVA's disparate license agreements be standardized, that license fees be determined on the basis of a percentage of gross receipts or of appraised market value in order to be in line with similar facilities in the industry, and that licensees/operators be required to make facilities available to the public and enforce license prohibitions on private use.

The agency also sought input from its Regional Resource Stewardship Council, an advisory committee established under the Federal Advisory Committee Act, § 9, 5 U.S.C.A App. 2, for the purpose of providing advice to TVA on management of properties under its control, the TVA reservoir system and natural resources on TVA property. The council recommended that license values be equal to private sector values, that a one-size-fits-all fee structure was inappropriate, that "[i]ndividuals that are benefitting from the TVA system should be providing some benefit back to TVA" (id. at 3), and that the agency should consider a fixed percentage tied to some measure of economic success.

The Defendant developed new license provisions to address the Inspector General's audit and Deloitte's recommendations, and sought feedback from campground and marina owners on the new provisions beginning in 2009. Among other things, the new licenses gave owners two options for their annual license payments: percentage of gross receipts or a market value option. The licenses also standardized length-of-stay requirements, which specified that

> [c]ampgrounds must be closed and all campsites completely vacated for 14 consecutive days per 12-month period. . . . Camping units can be stored onsite at a parking lot or an open field during this closure period. . . . TVA must have the opportunity to inspect the campground for compliance during this closure period. .

.. The 14-day period cannot be December 20 through January 4 unless approved by TVA. . . . A waiting list, lottery system, combination of both, or other TVA-approved method must be utilized to allocate seasonal campsites when the campground reopens after closure.

(Id. at 4.) Campground owners are permitted to identify any fourteen-day period within the twelve-month timeframe beginning on the first day of the new license terms. The length-of-stay requirements apply to all campgrounds located on TVA land, whether privately-run or TVA-owned-and-operated.

The current licenses of Plaintiffs Southern Komfort in Benton, Kentucky and Britton Ford in Springville, Tennessee provide that their use of TVA land is subject to the licenses' terms and conditions, that licenses are terminable by either party upon thirty days' notice, that licensees have no property interest in TVA land, and that residential use by the licensees' patrons is prohibited. TVA notified owners of campgrounds and marinas that existing license prohibition on permanent structures owned by campers would be strictly enforced; that all camper-owned roofs had to be removed by December 31, 2012; and that campsite decks could not be privately owned.

The Defendant reviewed the new license provisions to determine whether NEPA was triggered and, if so, what level of review was required. Because it determined that the replacement of an existing license with a new license had no impact on the physical environment, TVA decided that the action was properly classified under its Categorical Exclusion 9, TVA Procedures 5.2.9, which covers "[a]dministrative actions consisting solely of paperwork." (Id. at 6.) The Plaintiffs, however, take issue with the agency's classification.

The Campground Plaintiffs allege they are suffering an "undue burden both financially and emotionally" as well as a "socioeconomic impact on [their] campers and business[es]." (D.E. 18-1 at 2, 19-1 at 1.) Both facilities have long-time seasonal campers who utilize specific campsites year

after year close to the same family members and friends. The fourteen Individual Plaintiffs have averred harm to the quality of the "social environment" or economic harm caused by the Defendant's actions. They contend that the "quality of the human environment that exists along the Tennessee [R]iver where they escape to for rest, recreation and socializing with friends and family will be significantly affected . . ." (D.E. 14 ¶ 5.) Campers have indicated to the campground operators that the new requirements will force them to stay elsewhere.

*CLAIMS OF THE PARTIES AND ANALYSIS*

NEPA Claims.

NEPA is a procedural statute, enacted "to declare a national policy which will encourage productive and enjoyable harmony between man and his environment, and to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." Heartwood, Inc. v. Agpaoa, 628 F.3d 261, 263-64 (6th Cir. 2010) (citing 42 U.S.C. § 4321), *reh'g denied* (May 11, 2011); *see also* Friends of Tims Ford v. Tenn. Valley Auth., 585 F.3d 955, 968 (6th Cir. 2009). "Under NEPA, federal officials are required to assume the responsibility that the Congress recognized as the obligation of all citizens: to incorporate the consideration of environmental factors into the federal decision-making process." Heartwood, 628 F.3d at 264 (internal quotation marks omitted). "Officials comply with NEPA primarily by [requiring] an [Environmental Impact Statement ("EIS")] for any major Federal action significantly affecting the quality of the human environment." Id. (quoting Burkholder v. Peters, 58 F. App'x 94, 96 (6th Cir. 2003)) (internal quotation marks omitted). NEPA's implementing regulations define "human environment" as "the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14.

An EIS is a detailed statement that describes:

(I)  the environmental impact of the proposed action;

(ii)  any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii)  alternatives to the proposed action,

(iv)  the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v)  any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Heartwood, 628 F.3d at 264 (quoting 42 U.S.C. § 4332(2)(C)).  "If an agency does not believe that the federal action will have a significant impact on the environment, then NEPA's regulations permit the agency to conduct a less exhaustive [Environmental Assessment ("EA")]."  Id. (internal quotation marks omitted).  "If the EA reveals a significant impact, then the agency must prepare an EIS; if it does not, then the agency may simply issue a finding of no significant impact [("FONSI")]."  Id.  No EIS or EA is required, however, if the action at issue falls within a 'categorical exclusion,' which is defined under the applicable regulations to mean "a category of actions which do not individually or cumulatively have a significant effect on the human environment[.]"  40 C.F.R. § 1508.4; Alcoa, Inc. v. Bonneville Power Admin., 698 F.3d 774, 795 (9th Cir. 2012).

The Plaintiffs have alleged that NEPA required the Defendant to prepare an EIS or EA prior to issuing the new licenses.  In the instant motion, TVA asserts, however, that the Plaintiffs lack standing to challenge the agency's action.  "Federal courts have limited jurisdiction, and . . . can only exercise the powers vested in [them] by the Constitution and statute."  Heartwood, 628 F.3d at 266.  In order to demonstrate constitutional standing, a plaintiff must show

> (1) an allegation of an 'injury in fact,' which is a concrete harm suffered by the plaintiff that is actual or imminent, rather than conjectural or hypothetical; (2) . . . 'causation,' which is a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant; and (3) . . . 'redressability,' which is a likelihood that the requested relief will redress the alleged injury.

Friends of Tims Ford, 585 F.3d at 966. While NEPA does not authorize a private right of action, judicial review is granted through the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"). Id. at 964. Those seeking judicial review of agency action under the APA, as the Plaintiffs have in this case, "must not only meet constitutional requirements of standing, but must also demonstrate prudential standing, which exists if the interest that the plaintiff seeks to protect is arguably within the zone of interests to be protected or regulated by the statute in question." Id. at 966-67 (internal quotation marks omitted). Prudential standing is also met if plaintiffs allege they "suffered a legal wrong." Id. at 967. "The legal injury or interest sought to be protected must relate to agency action, which is defined to include failure to act." Id. (internal quotation marks omitted). An unincorporated association, such as Shoreline Alliance, must demonstrate associational standing,

> which is met when: (1) the organization's members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Id. (internal quotation marks omitted). Plaintiffs bear the burden of establishing standing. Id.

TVA argues that the Plaintiffs lack standing to pursue their NEPA claims because the economic, social and emotional impacts alleged are not within the zone of interests contemplated by NEPA. As the foregoing discussion of the purposes of NEPA makes clear, the zone of interests protected by the statute is environmental. See Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934, 940 (9th Cir. 2005) ("We have long described the zone of interests that NEPA protects as being environmental."), cert. denied sub nom. Ashley Creek Phosphate Co. v. Scarlett, 548 U.S. 903, 126 S. Ct. 2967, 165 L. Ed. 2d 950 (2006). Interests that are purely financial in nature, on the other

hand, do not fall within the ambit of the statute. Id. at 940-45. Accordingly, a litigant seeking relief under NEPA based on purely economic interests lacks prudential standing to bring such a claim. See id. at 940; see also Monsanto Co. v. Geertson Seed Farms, ___ U.S. ___ 130 S. Ct. 2743, 2756, 177 L. Ed. 2d 461 (2010) (noting that claim of economic harm does not strip litigant of prudential standing if coupled with environmental injury).

The declarations of the owners of Britton Ford and Southern Komfort provided to the Court reflect a threat to their financial interests as a result of the TVA's actions in the form of loss of customers. As indicated previously herein, the Individual Plaintiffs have also submitted declarations in support of their claims. David and Carole Merritt stated that they live in Cordova, Tennessee and have enjoyed a campsite at Perryville Marina Campground near Parsons, Tennessee for several years. They purchased supplies at stores in town, boated on the river, picnicked, bought a travel trailer with a cover and deck and leased a boat slip. Judy Barnhill, of Jackson, Tennessee, had leased the same site at the Perryville campground since 1992 and is surrounded by friends. Her family's campsite had a deck with rails and steps that they used with their travel trailer. The Barnhills also graveled the driveway. The campsite of Susan and Dwayne Hendrix, who live in Henderson, Tennessee, was located next to the Barnhills. They too built a deck, a top for their camper and graveled their driveway. The campsite was important to them because it allowed them to see old friends. Larry and Marilyn Halters, of Lexington, Tennessee, had leased the same campsite, which includes a camper cover and deck, at Perryville Marina since 2000. In their declaration, they related stories of lobster boils with neighbors and watching over one another's property. Judy Denmon, also a resident of Lexington, purchased a campsite at Perryville Marina along with her husband in 2006. As was the case with other campers, Denmon's site included a top and deck. She and her husband plan special events with other campers and enjoy visiting with their

grandchildren at the campground. Katharine Haskins lives in Bartlett, Tennessee and leased a campsite at the Perryville Marina in 2008. Subsequent to the lease, she added a camper cover to the site, which already sported a covered deck and walkway deck. She became an active member of the campground community, enjoying golf cart parades, annual poker runs and barbecues.

Snelling, a seventy-nine-year-old widow who lives in Greenville, Kentucky, stays at her campground trailer located at Southern Komfort about three days per week. Eddie McGregor of Calvert City, Kentucky, had also leased a site, which includes a deck, at the campground since 2010. He visits twelve to fifteen times per year and enjoys the quiet time it provides. Charles and Betty Whitlow are retired and live in Mayfield, Kentucky in the summer and Palm Beach Gardens, Florida in the winter. They have leased the same campsite at Southern Komfort since 2010 and spend weekends there during the summer months. As they are in their seventies, they leave their camper at the site and have added a canopy, deck furniture and a grill. Wayne and Nancy Courtney, of Mayfield, Kentucky, have leased the same campsite at Southern Komfort since 2011 and, like the Whitlows, keep their camper at the site and visit on weekends in summer. The site's deck and rail permit them to enjoy the location with their two dogs. Denise Wilson lives in Fancy Farm, Kentucky. She and her husband purchased a camper from another resident and have spent weekends and summer holidays at their site, leased in 2011, which includes a wood deck and small wood portable storage building. They chose Southern Komfort because their daughter and grandchildren were already regular campers there. All of the Individual Plaintiffs cited loss of relationships and the cost and inconvenience of having to move their campers on a regular basis as reasons for opposing the TVA's actions.

In support of its motion for summary judgment, the TVA cites to <u>Metropolitan Edison Co. v. People Against Nuclear Energy</u>, 460 U.S. 766, 103 S. Ct. 1556, 75 L. Ed. 2d 534 (1983). The

question before the United States Supreme Court therein was whether the Nuclear Regulatory Commission complied with NEPA when it considered if Metropolitan Edison should be permitted to resume operation of the Three Mile Island Unit 1 nuclear plant near Harrisburg, Pennsylvania subsequent to a serious accident that damaged the reactor. Metropolitan Edison Co., 460 U.S. at 768, 103 S. Ct. at 1558. People Against Nuclear Energy ("PANE") was an association of local residents who were opposed to further operation of reactors at Three Mile Island. Id. at 769, 103 S. Ct. at 1559. They asserted that restarting the reactor would cause severe psychological damage to those living in the vicinity, as well as serious damage to the stability, cohesiveness and well-being of the neighboring communities. Id., 103 S. Ct. at 1559.

The Supreme Court recognized that NEPA does not require an agency to assess *every* impact of a proposed action, but only its impact or effect on *the environment*. Id. at 772, 103 S. Ct. at 1560. The Court stated that

> [i]f we were to seize the word "environmental" out of its context and give it the broadest possible definition, the words "adverse environmental affects" might embrace virtually any consequence of a governmental action that some one thought "adverse." But we think the context of the statute shows that Congress was talking about the physical environment -- the world around us, so to speak. NEPA was designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment.

Id., 103 S. Ct. at 1560. In doing so, the Court pointed to the statements of the statute's principal sponsors, who explained to their colleagues thusly:

> What is involved in NEPA is a declaration that we do not intend as a government or as a people to initiate actions which endanger the continued existence or the health of mankind: That *we will not intentionally initiate actions which do irreparable damage to the air, land and water* which support life on earth We can now move forward to *preserve and enhance our air, aquatic, and terrestrial environments* to carry out the policies and goals set forth in the bill to provide each citizen of this great country a healthful environment.

Id. at 772-73, 103 S. Ct. at 1560-61 (internal quotation marks & citations omitted). Thus, the Court

concluded, "although NEPA states its goals in sweeping terms of human health and welfare, these goals are *ends* that Congress has chosen to pursue by *means* of protecting *the physical environment*." Id. at 773, 103 S. Ct. at 1561 (some emphasis added) (internal footnote omitted). The Court determined that, in the case before it, because the alleged harm did "not have a sufficiently close connection to the physical environment, NEPA [did] not apply." Id. at 778, 103 S. Ct. at 1563.

The Defendants have also cited to Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. United States Department of Agriculture, 415 F.3d 1078 (9th Cir. 2005). Therein, the United States Department of Agriculture (the "USDA") relaxed as to Canada its long-standing practice of barring importation of cattle and like animals from countries where Bovine Spongiform Encephalopathy (mad cow disease) was known to exist. Ranchers Cattlemen, 415 F.3d at 1084. The plaintiffs alleged economic concerns about the governmental action, and argued in addition that they would be "adversely affected by the increased risk of disease they face when Canadian beef enters the U.S. meat supply." Id. at 1103. The Ninth Circuit Court of Appeals held that, because NEPA's purpose is to protect the *physical* environment, the alleged harm was insufficient to fall within the statute's zone of interests. Id. at 1103-04.

The TVA equates the facts herein to those in the cited cases. Indeed, like the plaintiffs in Metropolitan Edison and Ranchers Cattlemen, the Plaintiffs in this case have neither alleged nor shown harm to the *physical* environment. The only harm asserted on behalf of the Campground Plaintiffs is economic, which does not rise to the level of a NEPA claim. *See* Norton, 420 F.3d at 940-45, *supra*. The creative allegation of the Individual Plaintiffs that the TVA's action in evicting their physical selves from their favorite campsites constitutes harm to the physical environment is not supported by the caselaw and, perhaps tellingly, they have cited to none. Thus, they too have failed to establish that NEPA applies and, therefore, that they possess prudential standing to bring

an action under the statute.  *See* <u>Morris v. Myers</u>, 845 F. Supp. 750, 757 (D. Or. 1993) (plaintiffs argued that homelessness and reduction in low-income housing were basis for NEPA standing, with which the court disagreed, stating that "[f]or homelessness to fall within NEPA's zone of interests, a reduction of available low-income housing must be a change in the physical environment as defined under NEPA . . . NEPA was [intended] to ensure that agencies consider the consequences of their actions on the land, air, water, and other natural resources upon which our society depends. Social and economic consequences of agency action may be considered under NEPA only if they are caused by damage to the physical environment.").  Because the Individual Plaintiffs lack NEPA standing, so does the Association. *See* <u>Friends of Tims Ford</u>, 585 F.3d at 967.  The Plaintiffs' NEPA claims are, therefore, DISMISSED.[3]

Although it has not been addressed by either party, the Court further finds that any necessary teardown of camper-owned decks, trailer covers and porches does not change its opinion.  "The demolition of buildings is not by itself a natural or physical effect on the environment." <u>Morris</u>,  845 F. Supp. at 757 (citing <u>Preservation Coalition, Inc. v. Pierce</u>, 667 F.2d 851, 857-58 (9th Cir. 1982)); *see also* <u>Comm. to Save the Fox Bldg. v. Birmingham Branch of Fed. Reserve Bank of Atlanta</u>, 497 F. Supp. 504, 511 (D. Ala. 1980) (plaintiff failed to establish NEPA standing where it adduced evidence on impact on an architecturally and historically significant building by its demolition but not evidence of impact on *physical* environment).  In any case, the Individual Plaintiffs have offered no evidence that the removal of structures built by them on their campsites constitutes a physical effect on the environment.

<u>IOAA Claim.</u>

---

[3]In light of the Court's determination that the Plaintiffs lack standing to assert claims under NEPA, it need not address the TVA's arguments in support of dismissal of those claims on the merits.

As previously noted, the license fees imposed on the Campground Plaintiffs[4] provided for two payment options: a percentage of gross revenue option and a market value option. (D.E. 20-1 at 1.) All licenses were to be automatically placed on the percentage of gross revenue option unless notification was received by the TVA that the market value option was preferred. (Id.) According to the Defendant, the percentage of gross revenue option

> is simply a method to calculate the rent amount for use of the public land in TVA's custody. A minimum rent rate will be established, and the operator will be required to pay the greater of the minimum rent rate or the [percentage gross revenue] calculation. The percentages are one percent of boat/motor/fuel sales, two percent of restaurant sales and four percent of all other sales.

(D.E. 16-2 at 1.) The TVA explained the market value option as permitting "agreement holders to pay rent based upon the market value of the raw land as restricted to commercial recreation." (Id. at 2.) Britton Ford and Southern Komfort have alleged herein that the fees are improper because (1) they exceed the regulatory cap for such fees set forth in 18 C.F.R. § 1310; (2) the basis for computing the fees violates the regulation's requirements; and (3) they are in fact a tax, which is outside the authority of the TVA to levy.

The IOAA states as follows:

> (a) It is the sense of Congress that each service or thing of value provided by an agency (except a mixed-ownership Government corporation[5]) to a person (except a person on official business of the United States Government) is to be self-sustaining to the extent possible.

> (b) The head of each agency (except a mixed-ownership Government corporation) may prescribe regulations establishing the charge for a service or thing of value provided by the agency. Regulations prescribed by the heads of executive agencies are subject to policies prescribed by the President and shall be as uniform as practicable. Each charge shall be --

---

[4]It appears to the Court that the IOAA claim has been alleged only as to these Plaintiffs.

[5]The TVA is not a "mixed-ownership Government corporation," but a "wholly-owned Government corporation." 31 U.S.C. § 9101(3)(N).

14

(1) fair; and

(2) based on --

     (A) the costs to the Government;

     (B) the value of the service or thing to the recipient;

     (C) public policy or interest served; and

     (D) other relevant facts.

(c) This section does not affect a law of the United States --

(1) prohibiting the determination and collection of charges and the disposition of those charges; and

(2) prescribing bases for determining charges, but a charge may be redetermined under this section consistent with the prescribed bases.

31 U.S.C. § 9701. The statute was passed in 1951 to "enable federal agencies that lacked specific fee-setting authority to recover the cost of providing certain services." Bunge Corp. v. United States, 5 Cl. Ct. 511, 515 (Cl. Ct. 1984), *aff'd* 765 F.2d 162 (Fed. Cir. 1985). Generally, the statute purports to endow agencies with broad discretion in setting fees. Id. The concern of Congress in passing the legislation was that the government was not receiving full return on services rendered to special beneficiaries and, thus, that it was undercharging for such services. Yosemite Park & Curry Co. v. United States, 686 F.2d 925, 930 (Fed. Cl. 1982). Overcharging by the government was not a consideration. Id. The United States Supreme Court cautioned in National Cable Television Association, Inc. v. United States, 415 U.S. 336, 94 S. Ct. 1146, 39 L. Ed. 2d 370 (1974), that the statute should be read "narrowly to avoid constitutional problems." Nat'l Cable Television Ass'n, 415 U.S. at 342, 94 S. Ct. at 1150.

Title 18 C.F.R. § 1310.1, promulgated pursuant to the IOAA, provides that "[t]he purpose of the regulations . . . is to establish a schedule of fees to be charged in connection with the

disposition and uses of, and activities affecting, real property in TVA's custody or control . . . and certain other activities in order to help ensure that such activities are self-sustaining to the full extent possible." The regulations state that the TVA will undertake certain actions, including "licenses and other uses of TVA land not involving the disposition of TVA real property or interests in real property," only "upon the condition that the applicant pay to TVA such administrative charges as the Senior Manager of the TVA organization that administers the land or permit being considered . . ., as appropriate, shall assess in accordance with § 1310.3[.]" 18 C.F.R. § 1310.2(a)(2). Under Section 1310.3,

> . . . the responsible land manager shall assess a charge which he/she determines in his/her sole judgment to be approximately equal to the administrative costs incurred by TVA for each action including both the direct cost to TVA and applicable overheads. In determining the amount of such charge, the responsible land manager may establish a standard charge for each category of action rather than determining the actual administrative costs for each individual action. The standard charge shall be an amount approximately equal to TVA's actual average administrative costs for the category of action. Charges shall be not less than the minimum or greater than the maximum amount specified herein . . . Use permits or licenses -- $50 - $5,000.

18 C.F.R. § 1310.3(a)(2). The administrative charges referred to in the regulation include the following costs:

> (1)     Appraisal of the land or landrights affected;
>
> (2)     Assessing applicable rental fees;
>
> (3)     Compliance inspections and other field investigations;
>
> (4)     Title and record searches;
>
> (5)     Preparation for and conducting public auction and negotiated sales;
>
> (6)     Mapping and surveying;
>
> (7)     Preparation of conveyance instrument, permit, or other authorization or approval instrument;
>
> (8)     Coordination of the proposed action within TVA and with other Federal,

State, and local agencies;

(9)     Legal review; and

(10)     Administrative overheads associated with the transaction.

18 C.F.R. § 1310.3(b).  The regulation provides that TVA may also impose fees in connection with "environmental reviews or other environmental investigations it conducts under its policies or procedures implementing [NEPA]."  18 C.F.R. § 1310.3(e).  In the event the actual administrative costs significantly exceed the established range, the agency "shall not proceed with the TVA action until agreement is reached on payment of a charge calculated to cover TVA's actual administrative costs."  18 C.F.R. § 1310.3(c).

From a reading of the regulation, entitled "Administrative Cost Recovery," it appears to the Court that it is meant to ensure TVA will receive remuneration for *administrative costs* associated with the issuance of licenses.  *See* <u>Lichterman v. Pickwick Pines Marina, Inc.</u>, Civ. Action No. 1:07CV256-SA-JAD, 2010 WL 1709980, at *2 (N.D. Miss. Apr. 23, 2010) ("Pursuant to its regulations, TVA charges fees for the administrative costs of processing permit applications," citing 18 C.F.R. § 1310).  The Court is not convinced that § 1310 acts as a cap on the amount of rent charged by the TVA for the use of real property by entities such as campsite operators, and the Campground Plaintiffs have cited to no authority supporting such a position.  Federal law clearly permits the TVA to enter into contracts and to convey by lease or otherwise real property "for the purpose of recreation or use as a summer residence, or for the operation on such premises of pleasure resorts for boating, fishing, bathing, or any similar purpose."  16 U.S.C. § 831c(d), (f), (k)(a).  Thus, the Court finds that Britton Ford and Southern Komfort have failed to show they are entitled to relief based on a violation of § 1310 by the TVA in charging in excess of $5,000 for the licenses at issue.

In the alternative, the Campground Plaintiffs maintain that the licenses constitute an improper tax, citing <u>National Cable</u>. In that case, the Supreme Court explained the difference between a tax and a fee thusly: "[t]axation is a legislative function, and Congress, which is the sole organ for levying taxes, may act arbitrarily and disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income," while a fee

> is incident to a voluntary act, *e.g.*, a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society.

<u>Nat'l Cable Television Ass'n</u>, 415 U.S. at 340-41, 94 S. Ct. at 1149 (internal footnote omitted).

The issue before the Court in <u>National Cable</u> was whether an annual fee for community antenna television systems (CATVs) assessed by the Federal Communications Commission (the "FCC") at a rate of thirty cents for each subscriber violated the IOAA. <u>Id.</u> at 340, 94 S. Ct. at 1148-49. The FCC determined the amount of the fee by estimating its total cost (both direct and indirect) for regulating the cable television industry and then devising a formula that reimbursed it for that amount. <u>Id.</u> at 343, 94 S. Ct. at 1150. The Court held that the "value to the recipient" language in the IOAA was the measure of an authorized fee, and, thus, fees imposed on the CATVs should have been assessed based on the benefits they received rather than on the costs to the FCC of services it renders to the public at large. <u>Id.</u> at 336, 94 S. Ct. at 1147.

It is the position of the Campground Plaintiffs that TVA's fee does not meet the "value to the recipient" standard, as it, like the subscription fee in <u>National Cable</u>, is based on the revenue realized by the licensee. However, the <u>National Cable</u> Court did not, as these Plaintiffs insist, hold that a market or revenue based fee is always a tax. Nor has <u>National Cable</u>'s progeny.

On the same day the Supreme Court issued its opinion in <u>National Cable</u>, it decided the

companion case of <u>Federal Power Commission v. New England Power Co.</u>, 415 U.S. 345, 94 S. Ct. 1151, 39 L. Ed. 2d 383 (1974).  In <u>New England Power</u>, the Federal Power Commission imposed an annual assessment against all electric utilities in proportion to their wholesale sales and interchange of power, and against all natural gas companies with operating revenues of $1 million or more in proportion to their deliveries of natural gas in interstate commerce.  <u>New England Power</u>, 415 U.S. at 345, 94 S. Ct. at 1152.  The Federal Power Commission stated in a report issued in connection with the assessment that "regulations have provided the foundation for the sound financial condition which public utilities and natural gas companies have achieved,'" and mentioned the "industry-wide recognition of the benefits accruing from only one facet of the Commission's activities -- the adoption of a uniform accounting system."  <u>Id.</u> at 348, 94 S. Ct. at 1153 (internal quotation marks omitted).

The Court recognized that the IOAA "reach[es] only specific charges for specific services to specific individuals or companies."  <u>Id.</u> at 349, 94 S. Ct. at 1154.  The Court also noted that "if we are to construe the [statute] to cover only 'fees' and not 'taxes' -- as we held should be done in [<u>National Cable</u>,] the 'fee' presupposes an application whether by a single company or by a group of companies."  <u>Id.</u>, 94 S. Ct. at 1154.  The Court cited to Circular No. A-25, issued in 1959 by what is now the Office of Management and Budget, which, in construing the IOAA, stated that "a reasonable charge 'should be made to each identifiable recipient for a measurable unit or amount of Government service or property from which he derives a special benefit.'"  <u>Id.</u>, 94 S. Ct. at 1154 (quoting Budget Circular A-25, Sept. 23, 1959).  The circular further provided that "no charge should be made for services rendered, 'when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public.'"  <u>Id.</u> at 350, 94 S. Ct. at 1154 (quoting Budget Circular A-25, Sept. 23, 1959).

The Court found that

> [s]ome of the assessments made by the Commission under its formula would be on companies which had no proceedings before the Commission during the year in question. The "identifiable recipient" of a unit of service from which "he derives a special benefit," to quote the Office of Management and Budget, does not describe members of an industry which have neither asked for nor received the Commission's services during the year in question. A blanket ruling by the Commission, say on accounting practices, may not be the result of an application. But each member of the industry which is required to adopt the new accounting system is an "identifiable recipient" of the service and could be charged a fee, if the new system was indeed beneficial to the members of the industry. There may well be other variations of a like nature which would warrant the fixing of a "fee" for services rendered. But what was done here is not within the scope of the [IOAA].

Id. at 351, 94 S. Ct. at 1155. The Court made no finding that the Federal Power Commission's revenue-based calculation violated the IOAA.

The revised version of the circular relied upon by the New England Power Court also fails to support the Campground Plaintiffs' view. It provides that "[a] user charge . . . will be assessed against each identifiable recipient for special benefits derived from Federal activities beyond those received by the general public." Circular No. A-25 Revised, www.whitehouse.gov/omb/circulars_a025/ at ¶ 6. The charge may be recovery of the "full cost to the Federal Government for providing the special benefit" or the "market price." Id. at ¶ 6a1. A special benefit exists when the government "enables the beneficiary to obtain more immediate or substantial gains or values (which may or may not be measurable in monetary terms) than those that accrue to the general public (e.g., . . . a license to carry on a specific activity or business or various kinds of public land use)." Id. According to the circular, "[n]o charge should be made for a service when the identification of the specific beneficiary is obscure, and the service can be considered primarily as benefit[t]ing broadly the general public." Id. Furthermore, "[c]harges will be made to the direct recipient of the special benefit even though all or part of the special benefits may then be passed to others." Id.

The Campground Plaintiffs also seem to suggest that they are not subject to a fee at all because TVA's activities are in the general public's interest. However, the circular does not support that view. *See* Circular A-25 Revised, *supra.* Moreover, it has been noted by courts that an agency "may recover the [f]ull cost of providing a service to an identifiable beneficiary, regardless of the incidental public benefits flowing from the provision of that service," which comports with the clear legislative intent of the IOAA that agency services be "self-sustaining to the full extent possible." *See* Miss. Power & Light Co. v. United States Nuclear Regulatory Comm'n, 601 F.2d 223, 230 (5th Cir. 1979), *cert. denied,* 444 U.S. 1102, 100 S. Ct. 1066, 62 L. Ed. 2d 787 (1980); *see also* Ayuda, Inc. v. Attorney Gen., 848 F.2d 1297, 1301 (D.C. Cir. 1988) ("So long as the service provides a special benefit, above and beyond that which accrues to the public at large, to a readily-identifiable [] individual, the fee is permissible."); Phillips Petroleum Co. v. Fed. Energy Regulatory Comm'n, 786 F.2d 370, 376 (10th Cir.) ("where an agency performs a service from which a regulated entity derives a 'special benefit,' it may charge a fee, even though the public also benefits"), *cert. denied sub nom.* Interstate Natural Gas Ass'n of Am. v. Fed. Energy Regulatory Comm'n, 479 U.S. 823, 107 S. Ct. 92, 93 L. Ed. 2d 44 (1986).

There appears to be no question that the Campground Plaintiffs applied for licenses to operate their campgrounds and marinas on TVA-owned land. This special benefit is a privilege denied to members of the general public. Any incidental benefit inuring to members of the public who might enjoy the recreational facilities provided by the Campground Plaintiffs on TVA land does not negate that privilege. The license fees at issue are not, in the Court's view, a tax pursuant to National Cable and subsequent decisions. *See* Nat'l Cable Television Ass'n, 415 U.S. at 340-41, 94 S. Ct. at 1149, *supra.*

*CONCLUSION*

For the reasons set forth herein, the motion for summary judgment is GRANTED and this matter is DISMISSED in its entirety.

IT IS SO ORDERED this 8th day of August 2013.

<u>s/ J. DANIEL BREEN</u>
UNITED STATES DISTRICT JUDGE